UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
AT LEXINGTON

CRIMINAL ACTION NO. 5:11-CR-42-KKC

UNITED STATES OF AMERICA,                                                        PLAINTIFF,

v.                       **RECOMMENDED DISPOSITION**

STEVEN ANTHONY FRANKLIN,                                        DEFENDANT.

** ** ** ** **

The Court considers a Motion to Suppress filed by Defendant Steven Anthony Franklin. DE #13. Alleging a Fourth Amendment violation, Franklin moves to suppress all evidence seized from his person and home, and any fruits thereof, on January 26, 2011. *Id.* The United States filed a Response (DE #14), and Defendant filed a Reply. DE #17. The Court conducted an evidentiary hearing on August 1, 2011. Having reviewed the briefs and considered the testimony given and argument made at the hearing, as well as the full record, the Court **RECOMMENDS** that the District Court **DENY** Defendant's motion to suppress. On this record, no basis for suppression exists.

I.      **Background Information**

At approximately 5:45 p.m. on January 26, 2011, Lexington Police Officer Adam Ray responded to a report of a stolen vehicle. DE #23 (Transcript of August 1, 2011, Evidentiary Hearing ("Tr.")), at 23-4. There was no indication the suspect had a gun or had threatened the victim. Tr. at 31.[1] While on his way to the scene, Ray learned that a vehicle matching the

---

[1] Officer Christopher Burlile, who did not respond to the initial report of the car theft, recalled the suspect allegedly had taken the car at gunpoint. Tr. at 5. The Court credits Ray's account since Ray was the initial responder, and Burlile conceded he was not certain whether the officers had any information that the individual involved possessed any firearm. Tr. at 17.

description of the stolen one had crashed into a telephone pole in the Highland subdivision in Lexington, and he proceeded to that location instead. Tr. at 24-5. When he arrived at the scene of the crash, Ray spoke with a constable, Mr. Clater, who had witnessed the accident. Tr. at 25. Clater reported that the driver of the car had fled toward the backyards of some houses on the street. *Id.* There was snow on the ground, and Ray noted footprints leaving the car and going to the backyards. Tr. at 26; 36. "The footprints were spaced far apart to indicate that somebody was running." Tr. at 26. Ray updated dispatch and waited for other officers to arrive. *Id.*

While Ray waited for other units to respond, nearby residents whose security system had captured video of the driver flagged the officer down. *Id.* Ray watched the video, which "showed a subject running from the direction of the crash, not from the vehicle itself but from the area where it was, through [the resident's] ... front yard, up his driveway, into his yard, and then disappearing over the fence in the rear of his house." Tr. at 38.

After spending five or ten minutes at the scene of the accident, Ray and Sergeant Brian Ray[2] followed the footprints, which (because of the shoe worn) had a "fairly specific marking" that enabled the officers to track the prints. Tr. at 26; 37-8. The footprints led the officers through a park, past some houses, across a couple of streets, and finally into the Coldstream subdivision and Arbor Station Way, where the footprints "literally led up to the front door of this house." Tr. at 26-7. Ray estimated that he and Brian Ray followed the footprints about a mile-and-a-half,[3] taking 45 minutes to an hour to reach the house. Tr. at 28.[4] No officer visually

---

[2]References to "Ray" are to Officer Adam Ray; references to "Brian Ray" are to Sergeant Brian Ray.

[3]According to Defendant's Motion, the accident occurred approximately one mile from his home. DE #13-1, at 1. The Government's brief, on the other hand, represents the footprints

followed the suspect from the scene of the accident. Tr. at 16.

Once they reached the house on Arbor Station Way, Brian Ray stood in the front, and Ray went to the right rear corner of the home. Tr. at 27. There was no sidewalk or path leading to the back corner. Tr. at 20. Ray testified they wanted to wait for other officers to arrive before making contact with the occupants, and he went to the back of the house to make sure no one fled in the meantime. Tr. at 38. Officers Christopher Burlile and Peres Lucka arrived on the scene after Ray and Brian Ray had taken their positions. Tr. at 27; 6. Burlile relieved Ray at the right rear corner of the house by the patio, and Lucka went to set up on the left rear corner.[5] Tr. at 27; 7-9; 19; 21.

After standing at the rear corner of the house for a few moments, Burlile saw someone peek out of the window, then the back door opened and a man exited the house. Tr. at 9. Burlile did not know if that man, who turned out to be Defendant, was the suspect who fled the scene of the accident. Tr. at 9-10. Burlile went to place his hands on Franklin, and he noticed Franklin carried a sawed-off shotgun in his left hand. Tr. at 10. Burlile took the gun from Franklin,

---

traveled only one-half mile. DE #14, at 2. The sworn testimony controls.

[4]Franklin's girlfriend, Tamil Stevenson, testified the suspected car thief, Devin Overstreet, was at their house approximately one-and-a-half to two hours before the police arrived. Tr. at 48. In his Motion, Franklin states he was arrested at 6:45 p.m., only one hour after the accident occurred. DE #13-1, at 3. The differences in these versions of the facts are not material to the Court's analysis.

[5]Franklin's back yard extends well behind the house. *See* Ex. 5 to Tr. Although Burlile could have set up a perimeter further away from the house, he did not do so because he "would have been exposed. So should the situation turn to something deadly, [he] would have left [himself] ... out in the open with no place for cover." Tr. at 14. Instead, he used the corner of the house as cover. Tr. at 14-15.

secured the firearm, and handcuffed Franklin. *Id.*[6] Meanwhile, Ray had started to knock on the front door of the house, but he did not ever do so because he heard Burlile announce the contact at the back of the house. Tr. at 16; 27. There is no dispute that the officers never attempted to obtain a warrant. Tr. at 15; 35.

According to Burlile, the serial number of the firearm Franklin was holding appeared to have been sanded off, and police arrested Franklin for possession of a defaced firearm. Tr. at 11.[7] Ultimately, a federal grand jury indicted Franklin for possession of an unregistered sawed-off shotgun in violation of 26 U.S.C. § 5861(d). Tr. at 12; DE #1 (Indictment). Franklin, through counsel, filed the instant motion challenging the admissibility of all evidence seized from his person and home, including the fruits of that evidence. Franklin argues that no exception to the warrant requirement allowed the officers to be at the back corner of his home or to seize the firearm.

## II.     Fourth Amendment Analysis

The Fourth Amendment guarantees "[t]he right of people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures[.]" U.S. Const., amend. IV. "In terms that apply equally to seizures of property and to seizures of persons, the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant." *Payton v. New York*, 100 S. Ct.

---

[6]Burlile later *Mirandized* Franklin, and Franklin allegedly stated someone had called him and told him the police were around his house, and he was trying to get rid of the firearm so the police would not find it. Tr. at 11.

[7]After arresting Franklin, officers searched the inside of the home and found the suspected car thief, Devin Overstreet, in the garage hiding under a car. Tr. at 32. Overstreet did not have his shoes on when discovered. *Id.*

4

1371, 1382 (1980). An area falling within the curtilage of a home receives the same protection. *United States v. Jenkins*, 124 F.3d 768, 772 (6th Cir. 1997) (citing *Oliver v. United States*, 104 S. Ct. 1735, 1742 (1984)) ("[T]he curtilage is considered part of the house itself for Fourth Amendment purposes.").

The Supreme Court has recognized four situations in which exigent circumstances obviate the warrant requirement: "(1) hot pursuit of a fleeing felon,[8] (2) imminent destruction of evidence, (3) the need to prevent a suspect's escape, and (4) a risk of danger to the police or others." *United States v. Huffman*, 461 F.3d 777, 782 (6th Cir. 2006) (citing *Brigham City v. Stuart*, 126 S. Ct. 1943, 1947 (2006)). The list is not exhaustive, however, and whether exigent circumstances exist ultimately depends on three factors: (1) whether the government needed to act immediately, (2) whether the government's interest in invading the home was sufficient to justify a warrantless entry, and (3) the balance between the government's interest and the defendant's privacy interest. *United States v. Rohrig*, 98 F.3d 1506, 1518 (6th Cir. 1996).

The government bears the burden of proving by a preponderance of the evidence that an exception to the warrant requirement applies. *See, e.g.*, *United States v. Washington*, 573 F.3d 279, 286 (6th Cir. 2009) (government bears burden of proving exigent circumstances); *United States v. Davis*, 283 F. App'x 370, 373 (6th Cir. 2008) (government must show consent to search by preponderance of the evidence). "The relevant inquiry is whether the facts are such that an objectively reasonable officer confronted with the same circumstances could reasonably believe that exigent circumstances existed." *Ewolski v. City of Brunswick*, 287 F.3d 492, 501 (6th Cir.

---

[8]Police sought Overstreet for stealing the car of a pizza delivery driver. This clearly would be felony theft under Kentucky law, thus satisfying the "felon" part of "fleeing felon." *See* KRS § 514.030. The defense does not contest the felony nature of the car theft.

5

2002).

A.   Entry into Franklin's side/backyard

Courts consider four factors in determining whether a particular location is within the curtilage of a home:

> [1] the proximity of the area claimed to be curtilage to the home, [2] whether the area is included within an enclosure surrounding the home, [3] the nature of the uses to which the area is put, and [4] the steps taken by the resident to protect the area from observation by people passing by.

*United States v. Dunn*, 107 S. Ct. 1134, 1139 (1987). Franklin's side/backyard where Ray and Burlile stood was close to the home (indeed, the officers were using the home as cover), and it was adjacent to the patio, which the evidence shows was used for private and intimate family activities. *See* Tr. at 42-43. On the other hand, there was no evidence that the yard was enclosed or blocked from view by a fence. The Sixth Circuit typically recognizes a proximate backyard as within a home's curtilage. *E.g.*, *Daughenbaugh v. Tiffin*, 150 F.3d 594, 601 (6th Cir. 1998) (backyard was curtilage); *United States v. Jenkins*, 124 F.3d 768, 773 (6th Cir. 1997) (same). The Court need not determine whether the area is curtilage to Franklin's home, though, because even if the officers did invade the curtilage without a warrant, they were authorized to do so pursuant to two exceptions on which they rely – hot pursuit and escape prevention.[9]

---

[9]The United States cites *Hardesty v. Hamburg Township*, 461 F.3d 646 (6th Cir. 2006), to support its alternative argument that the officers were lawfully present at the back of Defendant's home to perform a knock-and-talk. DE #14, at 4. *Hardesty* applies only in the situation "where knocking at the front door is unsuccessful in spite of indications that someone is in or around the house[.]" 461 F.3d at 654. The evidence shows that officers had not yet knocked at the front door when Ray and Burlile stood at the back corner, and the Government's reliance on *Hardesty* is therefore misplaced.

*1. Hot Pursuit*

In *Warden v. Hayden*, 87 S. Ct. 162 (1967), the Supreme Court held that the "exigencies of the situation" justified a warrantless search and seizure where police had information a suspected armed robber had entered a particular residence fewer than five minutes before they arrived. *Id.* at 1646. This "hot pursuit" exception typically applies when police are chasing a suspect, but it need not involve an "extended hue and cry in and about the public streets." *United States v. Santana*, 96 S. Ct. 2406, 2410 (1976) (quotations omitted). Nor must the time between the alleged crime and the conclusion of the chase be short. *See United States v. Holland*, 511 F.2d 38, 44 (6th Cir. 1975) (45-minute to 1-hour pursuit was within exception). The chain leading police to the suspect does not have to be direct, as long as it is continuous. *See id.* (exception applied where defendant was discovered at third house police visited during pursuit).

*Holland* provides useful guidance in this case. Police officers in *Holland* received an alarm approximately 15 minutes after a bank robbery, and they arrived at the bank within 10 minutes after the alarm. *Id.* at 39. The first detective on the scene circled the area in his car, and he found footprints in the snow that started approximately one block from the bank and led away from the bank. *Id.* at 39-40. The distance between the footprints indicated the person was running. *Id.* at 40. Because the shoe that had made the prints had a "kind of rare heel," the officer was able to follow the footprints with confidence that they were made by the same person. *Id.* The footprints ended at a house next to a spot where it appeared a car had been parked. *Id.* Based on information he learned from a woman at that house, the detective went to a second house, and his conversation with a man at the second house prompted the officer to go to yet a third house. *Id.* at 40-41. Officers arrived at the third house approximately 20 to 30 minutes

after they left the bank. *Id.* Although a girl who answered the door refused to let the officers inside, they entered without permission because they heard a noise coming from upstairs. *Id.* at 41-42. Upstairs, they found the initial suspect sitting on a couch and a second man – the defendant – behind an attic door. *Id.* The officers found bullets on the defendant's person and the gun that was used in the robbery where he had been lying. *Id.*

The District Court found, pursuant to *Hayden*, that the search did not violate the Fourth Amendment. *Id.* at 43-44. The Sixth Circuit affirmed, reasoning that although the time between the robbery and final search was relatively significant,

> the fact that there were three houses involved in this chain of circumstances and, hence, a somewhat longer pursuit, neither breaks the chain nor alters the concept of hot pursuit. The fact that the trail of running foot-steps, followed by [the detective] led to and ended at a driveway from which a car had recently departed, and that the scent followed by the police dog ended at the same place gave these officers ample reason to believe that the bandit had entered a car there. That car being identified to them by Eva Kirtdoll as one driven by her son, they proceeded immediately to where he and it were found, and there became aware from [the detective's] prior observation (confirmed by Kirtdoll) that another man had been in Kirtdoll's car with Billy shortly after the bank robbery. On being told that the man was Henry Gross, the officers doubtless decided to proceed to his home with the purpose of arresting him.

*Id.* at 44. The Court noted the facts were "very near the outer perimeter of he Hayden doctrine, albeit still within it." *Id.* at 46.

The facts of this case are well within the outer perimeter of the hot-pursuit exception envisioned by the *Holland* Court. Although the time between the car theft and the officers' arrival at Franklin's house was perhaps greater than in most cases, nothing broke the chain of Ray's direct pursuit. Two eyewitnesses told Ray the direction in which the subject had run, and Ray confirmed that information via videotape one of them provided. That information supported the conclusion that the footprints Ray followed belonged to the thief, and he was able to follow

those snowy tracks directly to Franklin's front door.  Under these circumstances, officers would have been justified in entering the house without a warrant, so merely establishing a perimeter outside to secure the area before speaking with the occupants of the house is not a Fourth Amendment violation, even if the perimeter is within the curtilage of the house.

Without question, on this record, Overstreet took flight from the accident scene, ultimately covering a great distance on foot and seeking shelter at Franklin's home.  The only reasonable inference is that he was seeking to avoid detection.  Officers acted immediately and tracked him from the crash site.  The pursuit was continuous and unbroken, terminating at the Arbor Station Way address.  Police had a strong basis for thinking the suspected felon was inside, and their decision to act immediately by setting up a perimeter that encompassed all angles around the home, rather than interrupting the operation to seek a warrant, was imminently proper and congruent with the Fourth Amendment's reasonableness touchstone.[10]

### 2. *Preventing Escape*

Law enforcement may also enter a home – including the curtilage around it – to prevent a suspect from escaping.  *Huffman*, 461 F.3d at 782.  Ray testified he could tell by the distance between the footprints in the snow that the suspect was running, a status verified by eyewitness accounts and video footage.  The suspect appeared to have run up to one-and-one-half miles from the scene of the accident, through private yards and public areas.  The officers could reasonably believe the suspect would continue his flight if and when he detected their presence, which most

---

[10]The Court is not persuaded by Franklin's argument that police could have stayed outside the curtilage and still effectively viewed the home from afar.  The limits of direct and hot pursuit of a felon do not require that authorities stay outside the curtilage; indeed the point of the doctrine is entry power.  Further, and related to the escape-prevention exigency, remote observation would offer little in terms of preventing continued flight.

likely would have happened once police knocked at the front door.

Pursuant to the preventing-escape exception to the warrant requirement, and considering the factors enumerated in *Rohrig*, 98 F.3d at 1518, the Court finds the officers did not violate Franklin's Fourth Amendment rights. The officers were pursuing a suspected felon who had stolen a car and run from the scene of an accident. It was reasonable immediately to set up a perimeter around the residence to which the suspect had apparently run to prevent further flight and potential escape.[11] The Government's interest in preventing the suspected felon's escape was sufficient to justify the measured entry here, which was into the curtilage, as opposed to the interior, of Franklin's home. Balancing the officers' important interest against Franklin's privacy interest in his side/backyard, the Court finds by a preponderance of the evidence that the officers were lawfully present at the rear corner of Defendant's home.[12]

       3.       *Government-Created Exigency*

Franklin argues that the police created any exigency on which they rely by entering the curtilage around his home. "It is well-established that police officers are not free to create exigent circumstances to justify their warrantless searches." *United States v. Ponder*, 240 F. App'x 17, 21 (6th Cir. 2007); *see Kentucky v. King*, 131 S. Ct. 1849, 1862 (2011) (noting, as to created-

---

[11]The fact that Overstreet had removed his shoes by the time the police officers arrived at the house – a fact the officers did not know until after Franklin emerged from the house and was arrested – is immaterial to the Court's analysis of whether the officers reasonably believed Overstreet was fleeing and might attempt to escape.

[12]Without question, authorities took a measured approach here. They simply created a perimeter as prudent staging in advance of a knock-and-talk. Under the required calculus of reasonableness, which the Fourth Amendment necessarily involves, the Court credits instead of criticizes police for a restrained approach in this context. The exigencies may have permitted police to enter the dwelling. The choice to wait and watch is an example of responsible policing.

exigency law: "the exigent circumstances rule applies when the police do not gain entry to premises by means of an actual or threatened violation of the Fourth Amendment"). But a police-created exigent circumstance exists only where the police have engaged in "deliberate conduct ... evincing an effort intentionally to evade the warrant requirement." *Id.* (quoting *Ewolski*, 287 F.3d at 504). The Court in *Ponder* found no such conduct where police entered a home while investigating a report that shots had been fired and a vehicle vandalized. *Ponder*, 240 F. App'x 17. The Court noted the investigation had begun only a few hours prior, and "the exigent situation naturally arose when they observed [the suspect] flee into the house." *Id.* at 21.

Similarly, the exigencies in this case – Overstreet's flight and entry into Franklin's house – arose in the natural course of the officers' continuous attempt to apprehend a suspected car thief. There is no indication authorities acted intentionally to evade the warrant requirement. Defendant's argument premised on a created exigency fails.

B.     Seizure of the sawed-off shotgun

Defendant argues that plain view did not authorize Burlile's seizure of the shotgun. Under that doctrine:

> Four conditions must be present before police may seize an item pursuant to the plain view doctrine: (1) the item must be in plain view; (2) the item's incriminating nature must be immediately apparent; (3) the item must be viewed by an officer lawfully located in a place from which the object can be seen; and (4) the item must be seized by an officer who has a lawful right of access to the object itself.

*United States v. Jenkins*, 124 F.3d 768, 774 (6th Cir. 1997). There is no dispute that the shotgun ultimately was in plain view from Burlile's position at the back corner of the house. With respect to its incriminating nature, Burlile immediately noticed the gun was sawed-off and

11

believed it was illegal for Franklin to possess such a weapon. Tr. at 11-12; *see also* 26 U.S.C. § 5861(d). Finally, it is well-established that when police are present pursuant to an exception to the warrant requirement and see in plain view an illegal item, they may lawfully seize that item. *Coolidge v. New Hampshire*, 91 S. Ct. 2022, 2037 (1971); *see also Rohrig*, 98 F.3d at 1525. Because the Court has determined Burlile was legitimately present at the back of Franklin's house, and from that vantage point he saw the sawed-off shotgun in plain view, Burlile had authority for the seizure.[13]

### III.   Recommendation

For the reasons discussed herein, the Court **RECOMMENDS** that the District Court **DENY** Defendant's Motion to Suppress (DE #13).

The Court directs the parties to 28 U.S.C. § 636(b)(1) for appeal rights concerning this recommendation, issued under subsection (B) of that statute. As directed by § 636(b)(1) and Federal Rule of Criminal Procedure 59(b), within fourteen days after being served with a copy of this

---

[13]The United States also tries to justify the seizure via warrant exceptions for officer safety and evidence preservation. "The presence of a weapon creates an exigent circumstance, *provided the government is able to prove they possessed information that the suspect was armed and likely to use a weapon or become violent*." *United States v. Bates*, 84 F.3d 790, 795 (6th Cir. 1996) (emphasis added); *but cf. United States v. Chapman*, 549 F.2d 1075, 1079 (6th Cir. 1977) (seizure of firearm during search pursuant to warrant was "justified by legitimate concern about police safety"). Information that a suspect is likely to resort to violence may come from the suspect's reputation or criminal history, the suspect's mental state, or reports of gunshots. *See Walters v. Stafford*, 317 F. App'x 479, 489 n.9 (citing cases). Here, there is no evidence the police had information that anyone inside the house was likely to use a weapon or dangerous. There is also no evidence in the record that Burlile believed or had any reason to believe that Franklin would have disposed of the sawed-off shotgun, or any other evidence, if Burlile did not immediately seize it; he did not learn until later that Franklin was supposedly trying to conceal the weapon because he knew police were at his house. The police were thus not justified in seizing the firearm under the officer-safety and destruction-of-evidence exceptions to the Fourth Amendment warrant requirement.

recommended decision, any party may serve and file written objections to any or all portions for *de novo* consideration by the District Court. The parties should consult the aforementioned statute and rule for specific appeal rights and mechanics. Failure to object in accordance with Rule 59(b) waives a party's right to review.

This the 31st day of August, 2011.

Signed By:
**Robert E. Wier** *REW*
United States Magistrate Judge